Garnell **RICHARDSON** and Patricia Richardson, as parents and legal representatives of Brooke Ashley Richardson, Petitioners,

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–324V.

United States Claims Court.

Aug. 2, 1991.

Marion E. Ray, Charleston, W. Va., for petitioners.

Carol Essrick, with whom were Asst. Atty. Gen. Stuart M. Gerson, Helene M. Goldberg, Director, John Lodge Euler, Deputy Director, and Charles R. Gross, Asst. Director, Washington, D.C., for respondent. Gemma Flamberg, Office of the General Counsel, Dept. of Health and Human Services, of counsel.

## OPINION

ANDEWELT, Judge.

This is a child vaccine action brought pursuant to the National Childhood Vaccine Compensation Act of 1986, as amended, 42 U.S.C. §§ 300aa–1 *et seq.* (West Supp.1991) (the Act). Petitioners, Garnell and Patricia Richardson, allege that their daughter, Brooke Richardson, born on March 5, 1983, suffered injuries compensable under the Act as a result of a DPT (diphtheria, pertussis, and tetanus) vaccine inoculation administered on July 7, 1983.

The petition initially was assigned to a special master pursuant to 42 U.S.C. § 300aa–12(d). During three days of hearings, the special master heard testimony from petitioners, three medical experts, and a rehabilitation consultant. The medical experts all agree that Brooke presently suffers from spastic quadriplegia and severe mental retardation. In an April 16, 1991, decision, the special master granted the petition and awarded compensation. In the instant action, respondent seeks review of the special master's decision. For the reasons set forth below, the special master's decision is sustained.

### I.

The Act sets forth procedures by which individuals can receive financial compensation for adverse physical effects resulting from the administration of a vaccine. Section 300aa–14 of the Act, entitled "Vaccine Injury Table," (1) identifies certain vaccines, (2) for each vaccine identified, specifies the illnesses, disabilities, injuries, or conditions (hereafter Table Injuries) that can result from administration of that vaccine, and (3) for each Table Injury specified, states a time period for the first symptom or manifestation of the onset of that Table Injury after administration of the vaccine. 42 U.S.C. § 300aa–14(a). In effect, the Act provides that if a petitioner can establish by a preponderance of the evidence that a vaccine recipient sustained a Table Injury and that the first symptom or manifestation of the onset of that injury occurred within the time specified in the Vaccine Injury Table, then there is a presumption that the administration of the vaccine caused the injury. 42 U.S.C. §§ 300aa–11(c)(1)(C)(i) and 300aa–13(a)(1)(A). If a petitioner makes such a showing and satisfies the other statutory requirements,[1] he or she is entitled to compensation unless there is a preponderance of the evidence that the injury "is due to factors unrelated to the administration of the vaccine." 42 U.S.C. § 300aa–13(a)(1)(B).

For the DPT vaccine, the Vaccine Injury Table lists "Residual seizure disorder" as a Table Injury. As to the applicable time period for the first symptom or manifestation of the onset of that disorder, the Act provides, in pertinent part, that a vaccine recipient (1) must not have suffered a seizure or convulsion unaccompanied by a fever of 102 degrees Fahrenheit or greater prior to the administration of the vaccine, (2) must have had his or her first seizure or convulsion within three days after administration of the vaccine, and (3) must have suffered two or more seizures or convulsions unaccompanied by a fever of 102 degrees Fahrenheit or greater within one year after the administration of the vaccine. 42 U.S.C. § 300aa–14(b)(2).

In concluding that these requirements for compensation were satisfied, the special master stated:

> Sufficient evidence exists in the record to support a finding that Brooke suffered a table injury, to wit, a residual seizure disorder, as defined in § 300aa–14 of the Vaccine Act, and that the first symptoms manifested themselves within the requisite 72 hours. The court bases its findings on the credible testimony of Mr. and Mrs. Richardson, which was supported by a diary kept by Mr. Richard-

---

1. Pursuant to Section 300aa–11(c), a petitioner must also demonstrate, *inter alia,* that the vaccine recipient (1) suffered the injury for at least six months and incurred unreimbursable medical expenses related to that injury in excess of $1,000 or died from the administration of the vaccine, and (2) received no award or settlement for the vaccine-related injury. 42 U.S.C. §§ 300aa–11(c)(1)(D) and 11(c)(1)(E).

son, and the medical opinions of Doctors William Cox and Mark Geier, petitioners' experts.

*Richardson v. Secretary, HHS*, No. 90–324V, slip op. at 3–4, 1991 WL 67483 (Cl.Ct. Apr. 16, 1991) (footnotes omitted). Concerning the statutory time period for the onset of the first symptoms of that injury, the special master concluded:

> 1) Brooke had not suffered from seizures prior to the administration of her second DPT, 2) the first manifestation of seizures occurred within the requisite three-day time frame, 3) the seizures were unaccompanied by fever in excess of 102 degrees, and 4) she continued to suffer from afebrile seizures during the succeeding 12 months.

*Id.* at 5. Specifically with respect to the three-day time frame for the first symptoms, the special master found:

> On the night of July 7, 1983, Brooke developed a fever and a shrill, piercing, high pitched scream which lasted approximately one hour. By the next morning, Brooke appeared normal to her mother.
>
> On July 9, 1983, two days after the second DPT shot, Mr. Richardson observed rapid repetitive rhythmical head movement back and upward.

*Id.* at 2. In addition, the special master rejected respondent's contention that a preponderance of the evidence demonstrates an alternative cause for the seizures. Respondent had alleged that the seizures were caused by cryptogenic infantile spasms. *Id.* at 5.

## II.

Respondent's motion for review focuses exclusively on the special master's finding with respect to the timing of the first symptoms or manifestation of the onset of Brooke's seizure disorder. Respondent does not dispute the special master's conclusions that Brooke suffers from a residual seizure disorder and that the evidence fails to establish an alternative cause for that disorder. With respect to the statutory requirements for the timing of the first symptom or manifestation of the onset of the seizure disorder, respondent does not dispute either that Brooke had not suffered any relevant seizures prior to the vaccine administration or that Brooke suffered the required two additional seizures within one year of the vaccine administration. Respondent's sole dispute relates to the special master's finding that the first symptoms of the seizure disorder occurred within three days of the administration of the vaccine. Respondent alleges that the first seizure occurred on July 17, 1983, ten days after administration of the vaccine.

This court recently summarized the standard for Claims Court review of a special master's decision under the Act in *Misasi v. Secretary, HHS*, 23 Cl.Ct. 322 (1991). Therein, the court stated:

> The Act provides that the special master's decision should not be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the [decision-maker]." *Motor Vehicle Mfg. Ass'n of the United States, Inc. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 [103 S.Ct. 2856, 2866, 77 L.Ed.2d 443] (1983). The touchstone of the arbitrary and capricious standard is rationality. *Hyundai Electronics Indus. Co. v. ITC*, 899 F.2d 1204, 1209 (Fed.Cir.1990). If the decision-maker has considered the relevant factors and has not made a clear error of judgment, its decision must be affirmed. *Id.*

*Id.* at 325. Respondent contends that the special master's conclusion that Brooke's seizure disorder first manifested itself within three days of the administration of the vaccine was irrational and, hence, fails under this standard.

## III.

First, respondent attacks the special master's reliance upon petitioners' testimony during the three days of hearings concerning the symptoms Brooke exhibited during the first 72 hours after administration of the vaccine. Respondent argues that petitioners' testimony was substantial-

ly inconsistent with their prehearing statements and past deposition testimony and with the medical records.

As to Mrs. Richardson, respondent alleges that there were significant differences among her affidavit, deposition testimony, and testimony during the evidentiary hearings. Upon review, however, Mrs. Richardson was consistent in relating Brooke's symptoms during the first two days after administration of the vaccine. Mrs. Richardson consistently indicated that on the evening of July 7, 1983, she heard an unexplained high-pitched scream from Brooke that lasted over an hour. As to the second day, July 8, Mrs. Richardson consistently stated that nothing unusual happened. The alleged inconsistencies primarily involve Brooke's condition after July 8. Mrs. Richardson was unable to provide precise dates for subsequent crying or seizure episodes. In at least one of her statements, Mrs. Richardson suggested that an additional significant incident may have occurred on the third day, July 9. However, the special master apparently did not rely upon Mrs. Richardson's testimony as to occurrences on the third day when the special master concluded that the first symptoms of a residual seizure disorder manifested themselves during the first 72 hours after administration of the vaccine. As noted above, as to the third day, the special master simply concluded that "Mr. Richardson observed rapid repetitive rhythmical head movement." Mrs. Richardson at no time suggested that Mr. Richardson did not make such an observation on the third day.

Respondent similarly attacks Mr. Richardson's testimony as containing inconsistencies. Again, these inconsistencies focus essentially on the precise dates of incidents rather than on whether the incidents actually occurred. With respect to the crucial 72–hour period, Mr. Richardson consistently testified that Brooke experienced high-pitched screaming on July 7, 1983. With respect to Brooke's "rhythmical head movement," Mr. Richardson indicated both in his affidavit and at the hearings that he witnessed the first rhythmical movement on July 9. At one point in his deposition testimony, Mr. Richardson indicated that he remembered these head movements as occurring during "the week of July 7." Respondent contends that Mr. Richardson's failure to indicate a specific date is inconsistent with him remembering that the head movements occurred on July 9. But when this deposition quotation is placed in context, it does not present a clear inconsistency. At an earlier point in his deposition, Mr. Richardson specifically indicated that the rhythmical head movements occurred on July 9. It is not clear that Mr. Richardson was contradicting this earlier statement when he made the more general testimony relied upon by respondent. Moreover, the July 9 date is supported by Mr. Richardson's notes kept in a diary in which he indicated that the rhythmical head movements occurred "on approximately July 9." [2]

Respondent bases its argument that petitioners' testimony is inconsistent with the medical records on the fact that the records of Brooke's medical examinations after the administration of the vaccine do not indicate that petitioners informed the doctors of the July 7 high-pitched screaming incident or the rhythmical head movement on July 9. But the absence of such references would not necessarily render petitioners' testimony not credible. Mr. Richardson, in effect, denies ever having been asked directly about those incidents and it is not apparent that petitioners themselves would necessarily have viewed the episodes as crucial in their discussions with the doctors. Moreover, by the date of Brooke's first examination following the administration of the vaccine, Brooke apparently had

**2.** Respondent faults the special master for giving any weight to these diary notes because the diary is self-serving and allegedly would be inadmissible in a trial conducted under the Federal Rules of Civil Procedure. But respondent agrees that the Act envisions informal procedures and that the federal rules are not controlling. Moreover, the special master considered the issue of authenticity and concluded that "extensive questioning by counsel convinced the court that the notes were authentic." *Richardson,* slip op. at 4 n. 5. It was not an abuse of discretion for the special master to consider the diary to the extent that she did.

suffered more serious seizures, and the focus of petitioners' comments to the doctors, not unexpectedly, was on those later seizures. It is not apparent that petitioners, as lay individuals, would be sufficiently sensitive to the medical issues involved to know that the July 7 and July 9 incidents were possibly related to the administration of the vaccine or to Brooke's subsequent seizure activity. The July 7 and July 9 incidents simply were not so obviously relevant at the time of the subsequent examinations that petitioners' apparent failure to mention them to the doctors should be deemed conclusive evidence that the acts never occurred.

Ultimately, the weight to be given to petitioners' testimony comes down to an issue of assessing witness credibility. Clearly, petitioners have a strong financial interest in the outcome of this action, and it is crucial that the special master evaluated their credibility with recognition of that interest. Indeed, the special master personally questioned both Mr. and Mrs. Richardson at some length in an apparent effort to evaluate the sharpness of their recollections and to assess their credibility. Ultimately, the special master concluded that they were credible. Assessments of credibility are uniquely within the purview of the trier of fact and the reviewing courts must give appropriate deference to the trier's conclusions. *Hambsch v. Dep't of Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986); *Hagmeyer v. Dep't of Treasury*, 757 F.2d 1281, 1284 (Fed.Cir.1985). Viewing the record as a whole, the court cannot conclude that the special master was arbitrary or capricious, abused her discretion, or was otherwise irrational when she classified petitioners' testimony as credible and relied upon that testimony to the extent that she did.

## IV.

█ Petitioners' testimony cannot by itself support an award of compensation under the Act. Section 300aa–13(a)(1) provides that an award of compensation may not "be based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Herein, as ex-plained above, there were no medical records substantiating petitioners' claim that the first symptoms of Brooke's seizure disorder occurred within 72 hours of the administration of the vaccine. Hence, petitioners relied upon the medical opinions of two doctors to support that claim. The special master summarized the doctors' testimony as follows:

> Both Dr. Mark Geier and Dr. William Cox testified to a reasonable degree of medical certainty that Brooke suffered an adverse reaction to the pertussis component of the DPT inoculation of July 7, 1983. As to the question of whether the initial head nods observed on July 9, 1983 constituted seizure activity, Dr. Geier deferred to other medical professionals more experienced in diagnosing seizures. Dr. Cox, however, did not hesitate to identify the episodes, described by the parents, as seizure activity. He based his opinion on his own experience and expertise in neuropathology and on the fact that similar incidents were subsequently observed by treating physicians and diagnosed as seizures.

*Richardson*, slip op. at 4.

Respondent contends that the July 7 high-pitched crying incident is consistent with a seizure disorder but is not indicative of one. As to Dr. Cox's testimony that the July 9 rhythmical head movement constitutes seizure activity, respondent contends that Dr. Cox is a neuropathologist and not a pediatrician or neurologist and therefore lacks the expertise to determine what child actions might be classified as first symptoms of a seizure disorder.

In response, clearly there are other medical specialties, such as pediatric neurology, in which doctors have far greater experience in evaluating and classifying seizure symptoms. But as a neuropathologist, Dr. Cox studies the causes of neurological disorders and regularly evaluates existing patient records and draws conclusions from them. Moreover, Dr. Cox apparently reviewed the literature relating to DPT vaccines and seizures. The special master questioned Dr. Cox at some length and

 

ultimately stated: "The court ascribed considerable weight to the testimony of Dr. Cox whose diagnostic expertise relating to the symptoms described by the parents was particularly persuasive." *Id.* at 4 n. 6. The decision to permit a witness to testify as an expert is within the discretion of the trier of fact. *Milmark Services, Inc. v. United States,* 731 F.2d 855, 860 (Fed.Cir. 1984) ("Since the admissibility of expert testimony is within the discretion of the trial judge, this action is to be sustained unless manifestly erroneous.") Based on Dr. Cox's background and his responses during *voir dire* questioning, the court cannot conclude that it was an abuse of discretion for the special master to allow Dr. Cox to testify as an expert.

Respondent's medical expert, Dr. Rita Lee, is a pediatric neurologist with extensive seizure-related experience. But her testimony, which generally reads quite convincingly, does not demand a conclusion different than the special master's. Dr. Lee expressed the opinion, apparently based exclusively on a review of the medical records, that "[Brooke] did not suffer a residual seizure disorder within three days." But, as explained above, the medical records do not discuss the incidents of either July 7 or July 9. With respect to the rhythmical head movements noticed by Mr. Richardson on July 9, the special master questioned Dr. Lee directly. Dr. Lee testified that while rhythmic backward movements may be strictly volitional, "if they are actual hard jerks then I think we can safely say they are seizures." In addition, Dr. Lee indicated that the violence of seizures can increase over time with the first manifestation of seizures sometimes involving jerking movements that are "not terribly obvious." Indeed, Dr. Lee acknowledged that seizures can be so subtle that even doctors would not recognize them as such without some reason to suspect.[3]

During the course of his testimony, Mr. Richardson demonstrated the head movement he saw on July 9. While demonstrating the movement, Mr. Richardson stated that "[a]s [the rhythmic pace] got stronger it would kind of pop like that." Dr. Lee, who testified over the telephone, indicated that in assessing whether a seizure occurred on July 9, it "may possibly have been helpful" for her to have witnessed Mr. Richardson's demonstration.

The special master viewed the demonstration and determined that Brooke had the requisite symptoms of a seizure disorder within 72 hours after administration of the vaccine. After reviewing the medical expert testimony in its entirety, the court cannot conclude that such a determination was arbitrary, capricious, or an abuse of discretion.

### Conclusion

For the reasons set forth above, the special master's April 16, 1991, decision is sustained and the Clerk of the Court shall enter judgment accordingly.

IT IS SO ORDERED.

---

**3.** Dr. Lee concluded: "If it's jerking, even small amplitude jerking, I think it's more likely that it's a seizure. If it's again a gentle bobbing, I've seen children do this for long periods of time. And there's nothing wrong with them at all."