20 F.3d 1
 62 USLW 2615, Prod.Liab.Rep. (CCH) P 13,850
 Mark SCHAFER and Melissa Schafer, a Minor By and Through
Mark Schafer, Natural Parent and Guardian of
Melissa Schafer, Plaintiffs, Appellees,
v.
AMERICAN CYANAMID CO., Parent of Lederle Laboratories, a
Division of American Cyanamid Co., Defendant, Appellant.
 No. 93-1422.
 United States Court of Appeals,
First Circuit.
 Heard Sept. 7, 1993.
Decided March 24, 1994.
 
 J. Peter Coll, Jr. with whom Charles W. Gerdts, III, Nicole M. van Ackere, Lawrence H. Cooke, II, Donovan Leisure Newton & Irvine, New York City, Thomas A. Mullen, and Fordham & Starrett, Boston, MA, were on brief, for appellant.
 Walter S. Kyle, Boston, MA, for appellees.
 Before BREYER, Chief Judge, SELYA and STAHL, Circuit Judges.
 BREYER, Chief Judge.
 
 
 1
 The National Childhood Vaccine Injury Act, 42 U.S.C. Secs. 300aa-1 to 300aa-34, provides a special procedure to compensate those who are injured by certain vaccines. The Act bars those who accept an award under that procedure from later bringing a tort suit to obtain additional compensation. Id. Sec. 300aa-21(a). The question before us in this appeal (under 28 U.S.C. Sec. 1292(b)) is whether the Act also bars the family of such a person from bringing a tort suit to obtain compensation for their own, related, injuries, in particular, for loss of companionship or consortium. Assuming that state law permits such suits, we find nothing in the Act that explicitly or implicitly bars them. And, we affirm the similar determination of the district court.
 
 
 2
 * Background
 
 
 3
 * The Statute
 
 
 4
 The National Childhood Vaccine Injury Act represents an effort to provide compensation to those harmed by childhood vaccines outside the framework of traditional tort law. Congress passed the law after hearing testimony 1) describing the critical need for vaccines to protect children from disease, 2) pointing out that vaccines inevitably harm a very small number of the many millions of people who are vaccinated, and 3) expressing dissatisfaction with traditional tort law as a way of compensating those few victims. Injured persons (potential tort plaintiffs) complained about the tort law system's uncertain recoveries, the high cost of litigation, and delays in obtaining compensation. They argued that government had, for all practical purposes, made vaccination obligatory, and thus it had a responsibility to ensure that those injured by vaccines were compensated. Vaccine manufacturers (potential tort defendants) complained about litigation expenses and occasional large recoveries, which caused insurance premiums and vaccine prices to rise, and which ultimately threatened the stability of the vaccine supply.
 
 
 5
 See generally National Childhood Vaccine Injury Compensation Act of 1985: Hearing on S. 827 Before the Senate Comm. on Labor and Human Resources, 99th Cong., 1st Sess. pt. 2 (1985) [hereinafter "Hearings on S. 827"]; Vaccine Injury Compensation: Hearings on H.R.5810 Before the Subcomm. on Health and the Environment of the House Comm. on Energy and Commerce, 98th Cong., 2d Sess. (1984) [hereinafter "Hearings on H.R.5810"]; National Childhood Vaccine-Injury Compensation Act: Hearings on S.2117 Before the Senate Comm. on Labor and Human Resources, 98th Cong., 2d Sess. (1984) [hereinafter "Hearings on S. 2117"]; H.R.Rep. No. 908, 99th Cong., 2d Sess. (1986) [hereinafter "Vaccine Act Report"], reprinted in 1986 U.S.C.C.A.N. 6287, 6344; Staff of the Subcomm. on Health and the Environment of the House Comm. on Energy and Commerce, 99th Cong., 2d Sess., Childhood Immunizations (Comm. Print 1986) [hereinafter "Childhood Immunizations" ]; Office of Technology Assessment, Compensation for Vaccine-Related Injuries (1980) [hereinafter "OTA Report"]; Denis J. Hauptly & Mary Mason, The National Childhood Vaccine Injury Act, 37 Fed.B.News & J. 452 (1990).
 
 
 6
 The Vaccine Act responds to these complaints by creating a remedial system that tries more quickly to deliver compensation to victims, while also reducing insurance and litigation costs for manufacturers. The Act establishes a special claims procedure involving the Court of Federal Claims and special masters (a system that we shall call the "Vaccine Court"). 42 U.S.C. Sec. 300aa-12. A person injured by a vaccine may file a petition with the Vaccine Court to obtain compensation (from a fund financed by a tax on vaccines). Id. Sec. 300aa-11. He need not prove fault. Nor, to prove causation, need he show more than that he received the vaccine and then suffered certain symptoms within a defined period of time. Id. Secs. 300aa-13, 300aa-14. The Act specifies amounts of compensation for certain kinds of harm (e.g., $250,000 for death, up to $250,000 for pain and suffering). Id. Sec. 300aa-15(a)(2), (4). And, it specifies other types of harm for which compensation may be awarded (e.g., medical expenses, loss of earnings). Id. Sec. 300aa-15(a).
 
 
 7
 At the same time, the Act modifies, but does not eliminate, the traditional tort system, which Congress understood to provide important incentives for the safe manufacture and distribution of vaccines. The Act requires that a person injured directly by a vaccine first bring a Vaccine Court proceeding. Id. Sec. 300aa-11(a)(2)(A). Then, it gives that person the choice either to accept the Court's award and abandon his tort rights (which the Act transfers to the federal government, id. Secs. 300aa-17), or to reject the judgment and retain his tort rights. Id. Secs. 300aa-21(a), 300aa-11(a)(2)(A)(i). (He can also keep his tort rights by withdrawing his Vaccine Court petition if the Court moves too slowly. Id. Secs. 300aa-21(b), 300aa-11(a)(2)(A)(ii).)
 
 
 8
 The Act additionally helps manufacturers by providing certain federal modifications of state tort law. For example, it forbids the award of compensation for injuries that flow from "unavoidable side effects," id. Sec. 300aa-22(b)(1); it frees the manufacturer from liability for not providing direct warnings to an injured person (or his representative), id. Sec. 300aa-22(c); it imposes a presumption that compliance with Food and Drug Administration requirements means the manufacturer provided proper directions and warnings, id. Sec. 300aa-22(b)(2); it limits punitive damage awards, id. Sec. 300aa-23(d); and it requires that the trial of any tort suit take place in three phases (liability; general damages; punitive damages), id. Sec. 300aa-23(a).
 
 
 9
 The upshot is a new remedial system that interacts in a complicated way with traditional tort lawsuits.
 
 B
 This Case
 
 10
 For present purposes, the relevant facts are simple. Lenita Schafer's small child, Melissa Schafer, received an oral polio vaccine distributed by American Cyanamid in October 1988. Lenita subsequently contracted polio (she and her family think) from Melissa's vaccine. About one year later, in December 1989, all three members of the Schafer family (Lenita, Melissa, and Lenita's husband, Mark) petitioned the Vaccine Court for compensation. In April 1990, Mark and Melissa withdrew their petitions (with permission of the Vaccine Court) and began this lawsuit against American Cyanamid, seeking damages under Massachusetts tort law for loss of Lenita's companionship and consortium. See 28 U.S.C. Sec. 1332 (diversity jurisdiction); Feltch v. General Rental Co., 383 Mass. 603, 421 N.E.2d 67, 70-72 (1981). Lenita, who did not withdraw her petition, eventually accepted a $750,000 award from the Vaccine Court for her own injuries, thereby giving up her right to bring a tort action. At that point, American Cyanamid asked the district court to dismiss Mark's and Melissa's suit on the ground that Lenita's acceptance of the Vaccine Court award barred not only a later tort action for her own injuries, but also a later tort action by family members for related injuries. The district court denied the motion. We review that denial under the authority of 28 U.S.C. Sec. 1292(b) (permitting appeal of interlocutory orders raising certain controlling questions of law).
 
 II
 The Basic Argument
 
 11
 Cyanamid concedes that this case focuses upon Mark's and Melissa's damages, not Lenita's; that Lenita received Vaccine Court compensation for her own damages, not Mark's or Melissa's; and that the Act's language explicitly bars Lenita, but not Mark or Melissa, from bringing a tort action to recover their own damages (which, we specify, will not duplicate Lenita's). Nonetheless, it argues that to permit Mark or Melissa to bring their own tort action (for related damages) would so seriously interfere with the Act's basic purposes that we must read the Act as implicitly barring those actions, just as it explicitly bars Lenita's. Although Cyanamid's counsel wants to call its argument one of "interpreting the Act in light of its basic policy," we believe that "pre-emption" is a better, alternative, label. The argument seems to amount to a claim that the state law that permits Mark or Melissa to bring this kind of suit so significantly interferes with the federal Act's ability to achieve its important federal purpose that the Constitution's Supremacy Clause requires the state law to yield to the federal law's implicit demand. See Michigan Canners & Freezers Assoc. v. Agricultural Mktg. & Bargaining Bd., 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984); Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). But, however one characterizes the argument, it has two essential elements--an important federal purpose and a significant state interference. And, we shall try to set forth these two elements of Cyanamid's argument in light of the Act's legislative history, and as persuasively as possible.
 
 
 12
 First, an important federal purpose of the Act is to free manufacturers from the specter of large, uncertain tort liability, and thereby keep vaccine prices fairly low and keep manufactures in the market. Vaccine manufacturers presented Congress with evidence that their tort insurance and litigation costs had begun to dwarf their vaccine production revenues. See Hearings on S. 827, supra, at 240 (discussing difficulty of obtaining insurance) (statement of Robert Johnson); Hearings on H.R. 5810, supra, at 229 (expected liability costs hundreds of times annual vaccine sales revenue) (statement of Robert Johnson); Childhood Immunizations, supra, at 88 (expected insurance premium increase of 50 to 300 percent). They argued that, as a result, some manufacturers had discontinued vaccine production (leaving only a handful of producers), while others had raised their vaccine prices significantly. See Childhood Immunizations, supra, at 63 (showing increases in DPT vaccine from 10 cents to three dollars per dose, and polio vaccine from 35 cents to a dollar and a half per dose).
 
 
 13
 Evidence in the hearing record indicated that compensation-related price increases or manufacturer withdrawal would cause serious harm. Vaccines benefit those who are vaccinated, and they have public benefits as well--when parents vaccinate their own children, they also help stop the spread of a disease that can injure others. And, even though vaccines themselves cause a small number of serious injuries or deaths, their widespread use dramatically reduces fatalities. For example, the DPT vaccine itself may cause 150 or so incidents of serious neurological damage and the polio vaccine may itself cause about five annual incidents of paralysis. See OTA Report, supra, at 51. But, before widespread vaccination, whooping cough, for example, killed about 7,500 (mostly) children in a single year, diphtheria killed about 15,000, and polio injured, paralyzed, or killed about 57,000. See Childhood Immunizations, supra, at 1, 6, 14. Thus, despite the price to be paid in vaccine-caused injuries, widespread vaccination--(about 13.5 million annual diphtheria and whooping cough (DPT) vaccine doses, about 18 million polio doses)--has virtually wiped out these devastating diseases.
 
 
 14
 The upshot is that, because vaccines benefit so many (and harm so few), even small vaccine price increases, if followed by even a small decline in vaccinations, can cause more public harm through added disease than the sum-total of all the harm vaccines themselves cause through side-effects. See, e.g., Hauptly & Mason, supra, at 452 (recounting how, in Japan, two deaths from DPT side effects led to withdrawal of the vaccine, which was followed by a whooping cough epidemic that killed forty-one children). For this kind of reason, the argument goes, Congress was importantly motivated not only by the desire effectively to compensate side-effect victims, but also by the desire to keep vaccine prices fairly low by reducing compensation costs. See, e.g., Hearings on S. 827, supra, at 5 (remarks of Sen. Hawkins); Hearings on S. 2117, supra, at 5 (statement of Sen. Grassley); Vaccine Act Report, supra, at 4-7, reprinted in 1986 U.S.C.C.A.N. at 6345-48.
 
 
 15
 Second, the availability of a state tort remedy for relatives of a victim interferes with the Act's efforts to lower manufacturers' costs. The Act seeks to achieve its cost-reducing purpose, not by denying compensation to victims (indeed, it imposes a tax upon vaccines in order to fund compensation), but by reducing the litigation and insurance costs related to lengthy, complex tort procedures and random large tort awards. The Act therefore imposes substantive and procedural limitations upon tort actions. And, more importantly, it discourages victims from bringing those traditional tort cases by providing fairly generous, more easily obtainable, Vaccine Court awards. A victim who obtains such an award may hesitate to give up that bird in the hand in return for a larger, but more speculative, tort law award. And, a petitioner to whom the Vaccine Court gives nothing may see no point in trying to overcome tort law's yet more serious obstacles to recovery.
 
 
 16
 But, Cyanamid points out, almost every victim has a family. And, almost every vaccine-related injury to a child will adversely affect the life of that family. In Cyanamid's view, if family members can bring a tort suit for loss of say, a child's companionship, even after the child accepts a Vaccine Court award, they will do so.
 
 
 17
 Cyanamid then says (and this is the most difficult part of Cyanamid's argument) that to permit a victim's family to bring a tort law case--even where the victim obtains a Vaccine Court award--threatens seriously to undermine the Act's "cost-related" advantages. The result will be a system in which manufacturers must pay both the Vaccine Court's easily-obtained compensation awards (through a tax) and also face large tort claims from family members. The latter means the very kind of large occasional tort awards and the kind of litigation costs that Congress hoped to diminish. Cyanamid concludes that the Act implicitly must hold family members to the election of the physically-injured victim. If that victim receives an award and can no longer pursue a court claim, then neither can the victim's family.
 
 III
 Our Response
 
 18
 Cyanamid's argument is not without force, but ultimately it does not persuade us, either as a matter of statutory interpretation or in terms of pre-emption law. First, one cannot easily interpret the statute as Cyanamid wishes, for the Act has no language at all that one might read as creating a bar to the type of suit before us. To the contrary, the Act subsection that creates the tort action bar says that it does not apply to this kind of lawsuit. The language that creates the bar, Sec. 300aa-11(a), says: "[n]o person may bring a civil action for damages" (except in accordance with the Act's Vaccine-Court-related rules) until a Vaccine Court petition "has been filed." It then states specifically that "this subsection" (i.e. the subsection with the tort action bar):
 
 
 19
 applies only to a person who has sustained a vaccine-related injury or death and who is qualified to file a petition for compensation under the Program.
 
 
 20
 42 U.S.C. Sec. 300aa-11(a)(9) (emphasis added). A person "is qualified to file a petition" only if that person suffered a relevant injury or death after he or she "received a vaccine ... or contracted polio from another person who received an oral polio vaccine." Id. Sec. 300aa-11(c)(1)(A). That is to say, unless a person "received a vaccine" or, like Lenita Schafer, caught polio from someone who did (or is the legal representative of such a person), he cannot file a petition. See, e.g., Head v. Secretary of Health and Human Servs., 26 Cl.Ct. 546, 547 n. 1 (1992) (parent of injured child cannot petition except in representative capacity), aff'd, 996 F.2d 318 (Fed.Cir.1993). And, if he cannot file a petition with the Vaccine Court, the Act says that its tort suit ban does not apply to him.
 
 
 21
 Moreover, this same language suggests that the Act sees the tort suit procedural bar and Vaccine Court compensation as opposite sides of the same coin. Yet the Act does not permit compensation for injuries to a family member (of the direct victim who takes the vaccine or catches polio from a vaccine taker). Indeed, it prohibits:
 
 
 22
 compensation for other than the health, education, or welfare of the person who suffered the vaccine-related injury with respect to which the compensation is paid.
 
 
 23
 Id. Sec. 300aa-15(d)(2). And, the Vaccine Court itself has interpreted this section as forbidding payment for psychological counseling for a victim's family unless it directly benefits the victim herself. See, e.g., Huber v. Secretary of Health and Human Servs., 22 Cl.Ct. 255, 257 (1991); Richardson v. Secretary of Health and Human Servs., No. 90-324V, 1991 WL 67483, at * 6, 1991 U.S.Cl.Ct. LEXIS 151, at * 18 (U.S.Claims Ct., Apr. 16, 1991), aff'd, 23 Cl.Ct. 674 (1991); Neese v. Secretary of Health and Human Servs., No. 89-85V, 1990 WL 541394, at 8, 1990 U.S.Cl.Ct. LEXIS 333, at * 23 (U.S.Claims Ct., Apr. 16, 1991); see also Vire v. Secretary of Health and Human Servs., No. 90-84V, 1990 WL 541739, at * 1 n. 2, 1990 U.S.Cl.Ct. LEXIS 513, at * 1 n. 2 (U.S.Claims Ct., Dec. 28, 1990) (Act does not provide for compensation of parents of injured child), aff'd, 954 F.2d 733 (Fed.Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 3030, 120 L.Ed.2d 900 (1992); Pease v. Secretary of Health and Human Servs., No. 89-98V, 1990 WL 541740, at * 2, 1990 U.S.Cl.Ct. LEXIS 64, at * 5 (U.S.Claims Ct., Feb. 1, 1990) (same); cf. 42 U.S.C. Sec. 300aa-14 (list of compensable injuries containing no reference to the kind of harm here at issue).
 
 
 24
 Second, the Act's legislative history does not point directly toward the "policy" conclusion that Cyanamid wishes us to draw. The legislative history says nothing at all about family members' tort suits. Its discussion of general purposes, as we have pointed out above, see p. 2, supra, indicates two major purposes, namely, providing compensation for victims and maintaining low vaccine costs. How does Cyanamid's argument take account of the "victim compensation" objective? Because the Vaccine Court does not provide a remedy for family members, to accept Cyanamid's argument would require us to conclude that Congress, without anyone saying a word about it, intended to deprive family members of all compensatory remedies. At the same time, the second leg of Cyanamid's argument--the claim that permitting this kind of suit would significantly interfere with Congress's cost control objective--has no specific empirical support in the legislative record; and, the claim does not prove itself. Given the difficulties of prevailing in a traditional tort suit, it is, at least, unclear that plaintiff families--particularly families of victims who have already received Vaccine Act compensation--will prevail so often, and obtain verdicts so large, that the jury awards, or the threat of those awards, would significantly raise vaccine prices or retard their distribution.
 
 
 25
 The legislative record's silence may reflect the vaccine manufacturers' view that family suits do not pose a particular practical problem, or the failure of any interested person to think about the matter, or a calculated decision by everyone to ignore the issue in the congressional hearings for fear of upsetting a carefully crafted compromise. But, regardless of the reason for the silence, our very uncertainty about how Congress would have answered the question means that Cyanamid has failed to show that this kind of action significantly undermines the Act's given objectives.
 
 
 26
 Third, to accept Cyanamid's argument--that the Schafer family cannot collect both a Vaccine Court award and loss of consortium tort damages--would create judicial inconsistency. The Vaccine Court has held that a parent can both obtain a loss of consortium "award" from a state court (or the settlement of a state law claim) and also obtain compensation for her vaccinated (and injured) child from the Vaccine Court. Abbott v. Secretary of Health and Human Servs., No. 90-1673V, 1992 WL 300899, 1992 Cl.Ct. LEXIS 473, rev'd on other grounds, 27 Fed.Cl. 792 (1993); cf. Massing v. Secretary of Health and Human Servs., 926 F.2d 1133, 1135-36 (Fed.Cir.1991); Head v. Secretary of Health and Human Servs., 26 Cl.Ct. 546, 549 (1992), aff'd, 996 F.2d 318 (Fed.Cir.1993). The Vaccine Court cases all involve families that brought the tort suit first, before the child accepted Vaccine Court compensation. But, it is difficult to find any policy that would justify permitting a family to bring a suit before the Vaccine Court awards compensation to a direct victim, but not after.
 
 
 27
 Fourth, even were the first three reasons far less persuasive, a host of legal interpretive doctrines would prevent us from finding in Cyanamid's favor in respect to any form of pre-emption. Pre-emption law, for example, cautions us against finding that a congressional act pre-empts a state law through silence. Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981). The negative presumption is even stronger when the state law at issue creates a remedy unavailable under federal law. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 251, 104 S.Ct. 615, 623, 78 L.Ed.2d 443 (1984); United Construction Workers v. Laburnum Construction Corp., 347 U.S. 656, 663-64, 74 S.Ct. 833, 837, 98 L.Ed. 1025 (1954); Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). And, it is virtually conclusive when Congress, in the very statute at issue, explicitly pre-empts other state law remedies but not the remedy at issue. See Cipollone v. Liggett Group, Inc., --- U.S. ----, ----, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992); 42 U.S.C. Secs. 300aa-22, 300aa-23 (precluding certain kinds of damages awards in state law suits; creating three-stage procedure for trying state law tort actions; specifying the availability of certain defenses; explicitly "preempt[ing]" any state law that would prohibit a person from bringing a tort action not barred by the Act); see also Greenwood Trust Co. v. Commonwealth of Mass., 971 F.2d 818, 823 (1st Cir.1992) ("In recent days, the High Court has made it pellucidly clear that, whenever Congress includes an express preemption clause in a statute, judges ought to limit themselves to the preemptive reach of that provision without essaying any further analysis under the various theories of implied preemption."), cert. denied, --- U.S. ----, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993).
 
 
 28
 We need not rely upon these presumptions, however. Nor need we rely upon the fact that numerous, rather analogous, state workers' compensation statutes explicitly say that they pre-empt consortium actions when it is their intent to do so. See, e.g., Ala.Code Sec. 25-5-53; Conn.Gen.Stat. Sec. 52-555d; Mass.Gen.L. ch. 152. It is sufficient that the Act's purposes do not point strongly towards pre-emption, and the Act's language suggests that pre-emption is not intended. Consequently, Cyanamid's arguments are better made to Congress than to this court. We agree with the district court that the Act, as currently written, does not bar the suit before us (described on pp. 3-4, supra ). And, its order refusing to dismiss the case, therefore, is
 
 
 29
 Affirmed.
 
 
 30
 STAHL, Circuit Judge (concurring).
 
 
 31
 While I concur in both the result and the reasoning of the majority opinion, I write separately to express my concern about the potential threat to the vaccine compensation program.
 
 
 32
 By virtue of the circumscribed scope of our authority and our inherent institutional limitations, we in the judicial branch must abide by the presumptions prescribed by traditional principles of statutory construction. At the same time, I cannot ignore the fact that, although compelled by law, the panel's decision heightens the tension between the two competing purposes of the vaccine compensation program: holding down vaccine prices by cutting litigation costs while ensuring that the injured are adequately compensated. The defendant suggests that the cost-benefit calculus counsels a different resolution of the conflict in the circumstances of cases such as the present one. Specifically, the defendant argues that the increase in litigation costs associated with compensating a relatively small group of victims' family members through state tort systems will place at risk a much larger group of unvaccinated individuals due to price sensitivity in the vaccine market. I consider this to be an issue of great importance, apparently overlooked at the time Congress drafted the statute. I respectfully suggest that this is an issue which Congress may wish to revisit.