<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 99-1133

 MASSACHUSETTS ASSOCIATION OF HEALTH MAINTENANCE ORGANIZATIONS,
                      Plaintiff, Appellee,

                               v.

           LINDA RUTHARDT, COMMISSIONER OF INSURANCE,
                     Defendant, Appellant.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

         [Hon. Richard G. Stearns, U.S. District Judge]

                             Before

                     Selya, Circuit Judge,
                Bownes, Senior Circuit Judge,
                  and Lipez, Circuit Judge.
                                
                                
                                
    Thomas A. Barnico, Assistant Attorney General, Commonwealth of
Massachusetts, with whom Thomas F. Reilly, Attorney General, was on
brief, for appellant.
    Clare D. McGorrian and Health Law Advocates on brief for Mass.
Senior Action Council, Health Care for All, Inc., Disability Law
Center, Gerontology Institute of the University of Mass.-Boston,
Center for Medicare Advocacy, Alzheimer's Disease and Related
Disorders Ass'n of Eastern Mass., and AIDS Action Committee of
Mass., amici curiae.
    John T. Montgomery, with whom Richard S. Weitzel and Ropes &
Gray were on brief, for appellee.

October 8, 1999

 SELYA, Circuit Judge.  The Commonwealth of Massachusetts
requires organizations that offer Medicare beneficiaries
supplemental health care insurance to provide full prescription
drug coverage.  When the federal government enacted legislation
that imposed its own imperatives on such organizations, an
association of health care providers sought a declaration that the
federal scheme preempted the Massachusetts drug-benefit directive.  
The United States District Court for the District of Massachusetts,
ruling ore tenus, found preemption.  We affirm.
I.  BACKGROUND
 If social programs are meant to furnish a safety net,
Medicare is a notoriously porous one.  A main cause of this
porosity is that most outpatient prescription drugs are not
covered.  As a result, Medicare beneficiaries who desire such
coverage must either purchase supplemental private insurance or
enroll in a health maintenance organization (HMO).  For many years,
Massachusetts HMOs, like their counterparts elsewhere, offered
benefit options ranging from no coverage for prescription drugs to
full coverage.  Then, in a bold stroke designed to improve health
care for the elderly and disabled, the Massachusetts legislature
passed a law commanding all supplemental providers to offer at
least one plan that includes unlimited outpatient prescription drug
coverage.  See Mass. Gen. Laws Ann. ch. 176K (West 1998) (effective
Jan. 14, 1994); Mass. Regs. Code tit. 211,  71.23 (1998)
(effective Jan. 1, 1995).
 The Medicare program, 42 U.S.C.  1395-1395ggg (1999),
remains a work in progress.  Since its inception in 1965, Congress
has made countless modifications to it.  Continuing in this mode,
Congress, as part of the fiscal 1997 budget bill, established the
Medicare+Choice Program (the Program).  See Balanced Budget Act of
1997 (BBA), Pub. L. No. 105-33  4001, 111 Stat. 251, 275-328
(codified at 42 U.S.C.  1395w-21 to w-28).  Participation in the
Program is conditioned on providers offering basic Medicare
benefits, meeting certain other statutorily defined criteria, and
neither charging more in premiums nor furnishing less in
supplemental benefits than the levels established through
regulation by the Secretary of Health and Human Services (the
Secretary).  See 42 U.S.C.  1395w-22, w-24, w-25, w-26.
 The BBA includes the following provisions discussing the
Program's preemptive effect:
                 (b) Establishment of other standards

                 . . .

                    (3) Relation to state laws

                           (A) In general

                             The standards established under
             this subsection shall supersede any
             State law or regulation (including
             standards described in subparagraph
             (B)) with respect to Medicare +
             Choice plans which are offered by
             Medicare + Choice organizations
             under this part to the extent such
             law or regulation is inconsistent
             with such standards.

                           (B) Standards specifically
             superseded

                             State standards relating to the  
             following are superseded under this
             paragraph:

                                (i) Benefit requirements.

                                 (ii) Requirements relating to
                inclusion or treatment of
                providers.

                                 (iii) Coverage determinations
                (including related appeals and
                grievance processes).

Id.  1395w-26.
 In April 1998, the Massachusetts Commissioner of
Insurance (the Commissioner), undaunted by the BBA, announced that
the Commonwealth would continue to require supplemental providers
to offer full prescription drug coverage.  See Bulletin No. 98-03
(Apr. 17, 1998).  In June 1998, the Secretary published an interim
final rule interpreting subparagraph (B) of section 1395w-26 to
nullify state benefit requirements (even those that are not
inconsistent with federal standards).  See 63 Fed. Reg. 34,968,
35,099 (June 26, 1998) (codified at 42 C.F.R.  422.402 (1998)).  
This rule remains in effect.  See 64 Fed. Reg. 7968 (Feb. 17,
1999).  Massachusetts promptly proclaimed that it would defy the
federal regulation and continue to enforce its drug-benefit
requirement "absent a judicial determination that any state law is
preempted."  Bulletin No. 98-07 (July 20, 1998).
 The Commonwealth's intransigence led the Massachusetts
Association of HMOs (the Association) to seek a declaration that
the BBA and the Secretary's rule preempt the Commonwealth's full
drug coverage requirement.  The federal district court obliged.  
The Commissioner appeals.
II.  ANALYSIS
 We begin by mapping the legal terrain and then turn to
the topography of the case at hand.
                        A.  An Overview.
 The Supremacy Clause provides that federal law "shall be
the supreme Law of the Land; . . . any Thing in the Constitution or
Laws of any State to the Contrary notwithstanding."  U.S. Const.
art. VI, cl. 2.  By virtue of this commandment, state law that
conflicts with federal law is a nullity.  See Maryland v.
Louisiana, 451 U.S. 725, 746 (1981);  Gibbons v. Ogden, 22 U.S. (9
Wheat.) 1, 210-11 (1824); M'Culloch v. Maryland, 17 U.S. (4 Wheat.)
316, 427 (1819); Greenwood Trust Co. v. Massachusetts, 971 F.2d
818, 822 (1st Cir. 1992).
 Preemption is strong medicine.  Thus, although the power
to preempt is absolute, its exercise is not lightly to be presumed.  
See Gregory v. Ashcroft, 501 U.S. 452, 460 (1991).  Rather, courts
"start with the assumption that the historic police powers of the
States [are] not to be superseded by . . . Federal Act unless that
[is] the clear and manifest purpose of Congress."  Rice v. Santa Fe
Elevator Corp., 331 U.S. 218, 230 (1947).  It follows inexorably
that congressional intent stands at the base of all preemption
analysis.  See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516
(1992).
 The Supreme Court generally distinguishes between express
and implied theories of preemption.  Express preemption occurs
"when Congress has 'unmistakably . . . ordained' that its
enactments alone are to regulate a [subject, and] state laws
regulating that [subject] must fall."  Jones v. Rath Packing Co.,
430 U.S. 519, 525 (1977) (quoting Florida Lime & Avocado Growers,
Inc. v. Paul, 373 U.S. 132, 142 (1963)).  Implied preemption is
more elusive; that concept "has a certain protean quality, which
renders pigeonholing difficult."  French v. Pan Am Express, Inc.,
869 F.2d 1, 2 (1st Cir. 1989).  Generally speaking, implied
preemption encompasses both "field" and "conflict" preemption
principles.  The former set of principles reflects the view that
Congress's intent to occupy a given field can be inferred from the
pervasiveness of federal regulation and/or the dominance of the
federal interest in a particular area of legislative activity.  See
Rice, 331 U.S. at 230; French, 869 F.2d at 2.  By contrast, the
latter set of principles reflects the idea that congressional
intent also can be deduced from circumstances such as inconsistency
or impossibility.  See Gade v. National Solid Wastes Mgmt. Ass'n,
505 U.S. 88, 98 (1992) (plurality op.).
 The Court recently offered additional guidance on the
proper approach to statutes that include explicit preemption
language.  In Medtronic, Inc. v. Lohr, 518 U.S. 470 (1996), the
Justices explained that although an express preemption clause may
indicate congressional intent to preempt "at least some state law,"
courts nonetheless must "identify the domain expressly pre-empted
by that language."  Id. at 484 (citation and internal quotation
marks omitted).  Two presumptions inform the process of determining
the scope of an express preemption clause.  First, the familiar
assumption that preemption will not lie absent evidence of a clear
and manifest congressional purpose must be applied not only when
answering the threshold question of whether Congress intended any
preemption to occur, but also when measuring the reach of an
explicit preemption clause.  See id. at 485.  Second, while the
scope determination must be anchored in the text of the express
preemption clause, congressional intent is not to be derived solely
from that language but from context as well.  See id. at 486
(acknowledging as "relevant" data "the structure and purpose of the
statute as a whole, as revealed not only in the text, but through
the reviewing court's reasoned understanding of the way in which
Congress intended the statute and its surrounding regulatory scheme
to affect business, consumers, and the law" (citations and internal
quotation marks omitted)); accord California Fed. Sav. & Loan Ass'n
v. Guerra, 479 U.S. 272, 284 (1987) (explaining that, in such
circumstances, a court "must examine the [act's] language against
the background of its legislative history and historical context").
                        B.  The Merits.
 Against this legal landscape, we turn to the merits.  Our
review is plenary.  See Philip Morris Inc. v. Harshbarger, 122 F.3d
58, 62 (1st Cir. 1997).
                               1.
 On its own, section 1395w-26(b)(3)(B) appears to reflect
an unqualified congressional desire to preempt state standards
relating to, inter alia, benefit requirements.  The following
excerpt drives the point home:
                    State standards relating to the following
        are superseded under this paragraph:

                           (i) Benefit requirements.

                           (ii) Requirements relating to inclusion
             or treatment of providers.

                           (iii) Coverage determinations (including
             related appeals and grievance processes).

Noting that the Commissioner does not dispute that the
Massachusetts law and regulation mandating a full prescription drug
coverage option are "state standards relating to . . . benefit
requirements," the Association invites us to declare that the
quoted passage ends the matter.
 We decline the Association's invitation to read
subparagraph (B) as an entirely free-standing statutory provision
for two reasons.  For one thing, the text of the subparagraph
includes the phrase "under this paragraph."  The Association
attempts to slough off these words as "nothing more than a drafting
formality, akin to stating 'hereunder,'" and optimistically
suggests that the phrase refers only to the paragraph's title
("Relation to state laws") and not to the conjoined subparagraphs
that together constitute "this paragraph."  Appellee's Brief at 24
n.5.  Although it is true that courts sometimes rely on the titles
of statutory enactments in plumbing their meaning, see, e.g.,
United States v. Chapman, 60 F.3d 894, 897-98 (1st Cir. 1995), that
practice should not be indulged at the expense of the text itself.  
For another thing, even if subparagraph (B) included no external
referent, we would consider ourselves obliged to examine the
statutory provision in context.  See Medtronic, 518 U.S. at 486;
see also O'Connell v. Shalala, 79 F.3d 170, 176 (1st Cir. 1996)
(warning that statutory construction should never proceed by
"focus[ing] with Cyclopean intensity" on a single provision).
 What, then, does it mean to be "superseded under this
paragraph"?  The Commissioner accurately observes that the
paragraph includes subparagraph (A), which provides:
                    The standards established under this
        subsection shall supersede any State law or
        regulation (including standards described in
        subparagraph (B)) with respect to Medicare +
        Choice plans which are offered by Medicare +
        Choice organizations under this part to the
        extent such law or regulation is inconsistent
        with such standards.  [Emphasis supplied.]

From the parenthetical reference to subparagraph (B), the
Commissioner deduces that subparagraph (A) circumscribes the
preemptive scope of subparagraph (B) by applying a conflict
preemption regime to all state standards, including those that
relate to benefit requirements.  Because Massachusetts law insists
upon additional benefits, her thesis runs, it is not inconsistent
with federal law.  See, e.g., 42 U.S.C.  1395w-22(a)(1)(B)
(mandating that Medicare+Choice plans shall provide additional
benefits required under section 1395w-24(f)(1)(A)); id.  1395w-
24(f)(1)(E) (clarifying that nothing in subsection 1395w-24(f)
shall be construed as preventing organizations from providing
supplemental benefits described in section 1395w-22(a)(3)); id.  
1395w-22(a)(3)(C) (similarly emphasizing that organizations may
provide additional benefits).  Thus, the Commonwealth's ukase
should be allowed to operate ex proprio vigore.
 The Commissioner's interpretation possesses a patina of
plausibility.  In the last analysis, however, it would diminish
subparagraph (B) to a list of examples   a role that the text and
context of the subparagraph belie.  This subparagraph declares that
certain state standards "are" superseded under the paragraph; it
does not intimate that these standards "may" be preempted if the
Secretary promulgates particular types of regulations.  As a
general matter, we are loath to reduce statutory language to a
merely illustrative function, and the language of this subparagraph
does not readily invite a departure from that norm.  This is
particularly true when we recollect that "[a]ll words and
provisions of statutes are intended to have meaning and are to be
given effect, and no construction should be adopted which would
render statutory words or phrases meaningless, redundant or
superfluous."  United States v. Ven-Fuel, Inc., 758 F.2d 741, 751-
52 (1st Cir. 1985).  Though a list of examples is not necessarily
superfluous   Congress may consider a specific point important or
uncertain enough to justify a modicum of redundancy   the
surrounding statutory framework compels a finding of superfluity in
the case of subparagraph (B).  In the same subsection, the
Secretary is enjoined to "establish by regulation . . . standards
. . . for Medicare + Choice organizations and plans . . . to carry
out this part," 42 U.S.C.  1395w-26(b)(1), and the subject areas
enumerated in subparagraph (B) are unquestionably central to the
Medicare+Choice program, see, e.g., id.  1395w-22 ("Benefits and
beneficiary protections"); id.  1395w-22(f) ("Grievance
mechanism"); id.  1395w-22(g) ("Coverage determinations,
reconsiderations, and appeals").  In this context, it strains
credulity to suppose that, absent this cryptic parenthetical, the
Secretary would overlook the need for regulation in these vital
areas.
 Withal, the rule against superfluity can be a double-
edged interpretive sword.  Were the parenthetical in subparagraph
(A) otherwise inexplicable, we would be faced with an unhappy
choice between nullifying the parenthetical or reducing
subparagraph (B) to mere window-dressing.  Ordinary prudence, then,
counsels in favor of searching the full paragraph's text and the
surrounding statutory framework to see whether they collectively
suggest a more substantive role for subparagraph (B), consistent
with the odd parenthetical that appears in subparagraph (A).  To
this end, we mull three theories that the Association hawks.
 The district court embraced the first of the
Association's theories:  that the parenthetical simply authorizes
the Secretary to promulgate, among other standards, regulations
pertaining to the subject areas specifically preempted by
subparagraph (B).  On this reasoning, subparagraph (A) describes
the manner in which state standards are preempted by federal
regulations, whereas subparagraph (B) declares that certain state
standards are specifically superseded by the BBA itself.  This
hypothesis fails because it depends on the faulty assumption that
the Secretary is blind to the rest of the statute.  After all, the
parenthetical is not the source of the Secretary's rulemaking
authority in these areas; section 1395w-26(b)(1) fills that role.
 What is more, subparagraph (B) would represent a curious
placement for a provision describing the preemptive effect of the
BBA itself.  The subparagraph provides that certain state standards
are superseded "under this paragraph"   not "under this part"   and
the relevant paragraph appears in a subsection that orders the
Secretary to establish standards by regulation.  A far more logical
location for an announcement of the BBA's preemptive effect would
be section 1395w-22, which outlines the statutory benefit
requirements for Medicare+Choice plans.  For these reasons, we
reject the Association's first theorem.
 The Association's remaining two theories are:  (1) that
the parenthetical informs the Secretary that she has interpretative
authority to determine whether a particular state standard falls
into one of the categories enumerated in subparagraph (B); and (2)
that it puts the Secretary on notice that certain types of state
laws are deemed per se to clash with her regulations (should she
promulgate any).  At first blush, both of these attributions may
seem extraneous.  Subparagraph (B) is obviously within the "part"
which the Secretary is instructed to implement via regulation, see
42 U.S.C.  1395w-26, and one might think it equally obvious that
the Secretary's power extends to subparagraph (B) itself.  But that
glib conclusion overlooks that the presumption against preemption
applies to the task of defining the scope of an express preemption
clause.  See Medtronic, 518 U.S. at 485.  Hence, the general
delegation provision in paragraph (1) may not by itself resolve the
potential deadlock between the presumption and the need for
deference to agency expertise.  See Chevron U.S.A. Inc. v. Natural
Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984); see
generally Jack W. Campbell IV, Regulatory Preemption in the
Garcia/Chevron Era, 59 U. Pitt. L. Rev. 805 (1998).
 This brings us to Smiley v. Citibank (S.D.), N.A., 517
U.S. 735, 743-44 (1996), in which the Court unanimously held that
deference to a regulation that defines an ambiguous term in a
substantive statutory provision is appropriate, even though the
effect is to preempt state law.  The Smiley Court distinguished
Cipollone v. Liggett Group, Inc., 505 U.S. 504 (1992), on the
ground that the issue there involved the meaning of an express
preemption clause.  See Smiley, 517 U.S. at 744.  Thus, Smiley left
open the question of what happens when the strong centrifugal force
of deference to an agency's interpretation of an express preemption
clause comes into contact with the strong centripetal force of the
presumption against preemption.
 The intervening decision in Medtronic only complicates
matters.  There, five Justices accorded what appears to be an
intermediate level of deference to an agency's interpretation of
the scope of an express preemption provision.  See Medtronic, 518
U.S. at 496 (according the agency's interpretation "substantial
weight"); id. at 505-06 (Breyer, J., concurring) (allowing the
agency a "degree of leeway").  Against the backdrop of this
doctrinal uncertainty, the parenthetical here may well indicate
that Congress intended the Secretary's regulations, including those
designed to delineate the reach of subparagraph (B), to warrant at
least some measure of deference, the non-preemption presumption
notwithstanding.
 Although this distinction seems plausible, we need not
rest our decision on it.  The Association says that the most
logical purpose of the parenthetical is to put the Secretary on
notice that state standards in particular areas create a per se
conflict with federal regulation.  On its own, this proposed
function merely restates the argument's conclusion.  If
subparagraph (B) clearly provides for the automatic preemption of
state law in the three listed categories, then it affords ample
notice to the Secretary without recourse to (or need for) the
parenthetical in subparagraph (A).  Despite this deficiency,
however, the appellee's argument contains a solid kernel of truth.  
The important idea is not notice but, rather, the implied
suggestion of a special category of inconsistency.  Recognizing
this fact brings the most natural reading of subparagraph (B) and
the earlier parenthetical into focus, and supplies the last piece
of the interpretive puzzle.
 We believe that paragraph (3) as a whole concerns the
relationship between federal regulations and state criteria.  This
follows from the placement of the paragraph in a section that deals
with the establishment of standards by the Secretary, not in the
section containing the relevant self-executing provisions.  As part
of this construct, subparagraph (A) provides a general rule of
conflict preemption that (as the parenthetical and title ["In
general"] make clear) applies universally   that is, all state
standards are preempted to the extent they are inconsistent with
federal regulations.
 Subparagraph (B) goes a step further.  It says in
unqualified terms that state standards relating to three enumerated
areas "are superseded under this paragraph."  In context, we think
this means that state standards concerning these three enumerated
areas are deemed to be per se inconsistent with any federal
regulation.  This taxonomy makes sense when one considers the
centrality of the enumerated areas vis--vis the Medicare+Choice
program.  Subparagraph (B) thus makes explicit what might well have
been implied:  the anticipation that, once promulgated, federal
regulations will dominate these particular fields, leaving no room
therein for state standard-setting.
 The distinction between this interpretation and the
theory advanced by the Association, as we parse the statutory
scheme, is that state standards in the three enumerated areas are
not expressly preempted unless and until the Secretary triggers
preemption by promulgating regulations.  This makes sense in light
of the intentionally skeletal nature of the statute.  Congress, in
the midst of enacting a massive budget bill, chose not to limn the
exact parameters of a complex new program.  Instead, it provided
the ossature and left the Secretary the duty of adding flesh and
sinew by regulation.  Perhaps Congress believed that to preempt
state law before the Secretary made the Program's corpus complete
would have been premature.  In all events, once the Secretary
established regulations pursuant to subsection (b)   as she has
done, see 42 C.F.R. pt. 422   the Commonwealth's requirement that
supplemental health care providers must offer full prescription
drug coverage became ineffectual.
 There is a final and decisive textual argument, not made
by the parties or the amici.  Paragraph (1) of section 1395w-25(a)
requires Medicare+Choice organizations to be licensed under state
law.  Paragraph (2) outlines a mechanism whereby provider-sponsored
organizations can secure waivers of this requirement from the
Secretary.  As a condition to procuring such a waiver, an
organization must comply with all state consumer protection and
quality standards insofar as such standards "are consistent with
the standards established under this part."  Id.  1395w-
25(a)(2)(G)(i)(III).  In the very next sentence, the statute warns
that "[s]uch standards shall not include any standard preempted
under section 1395w-26(b)(3)(B) of this title."  This warning is
gibberish unless subparagraph (B) itself preempts certain state
standards   an assumption that is fundamentally incompatible with
the Commissioner's characterization of that subparagraph as a mere
list of examples.

                               2.
 Although textual analysis resolves the statutory
construction issue, we sometimes have looked to legislative history
to confirm textual intuitions.  See, e.g., United States v. Meade,
175 F.3d 215, 219 (1st Cir. 1999); Barker v. United States Dep't of
Labor, 138 F.3d 431, 436 (1st Cir. 1998).  In an abundance of
caution, we do so here.
 A brief survey of the BBA's legislative history
reinforces our belief that we have reached the correct destination.  
The conference report that preceded the law's passage lacks any
compelling evidence that Congress intended to limit the preemption
of state benefit requirements to those that directly conflict with
federal law.  To the contrary, the committee justified the
preemption paragraph on the following basis:
     The Conferees believe that the
 Medicare+Choice program will continue to grow
 and eventually eclipse original fee-for-
 service Medicare as the predominant form of
 enrollment under the Medicare program.  Under
 original fee-for-service, the Federal
 government alone set legislative requirements
 regarding reimbursement, covered providers,
 covered benefits and services, and mechanisms
 for resolving coverage disputes.  Therefore,
 the Conferees intend that this legislation
 provide a clear statement extending the same
 treatment to private Medicare+Choice plans
 providing Medicare benefits to Medicare
 beneficiaries.

H.R. Conf. Rep. No. 105-77, at 638, reprinted in 1997 U.S.C.C.A.N.
176, 259.  This excerpt demonstrates that Congress intended the
federal government   and the federal government alone   to set
requirements anent "covered benefits."  
 The Commissioner accepts this conclusion, but strives to
carve out an exception large enough to shelter the Commonwealth's
drug-benefit mandate.  She argues that supplemental benefits do not
constitute either "covered" or "Medicare" benefits, so the quoted
passage cannot be read to manifest an intent to preempt state
regulation of supplemental benefits.  This argument fails to
persuade.  In the first place, the corresponding statutory
provision addresses "[b]enefit requirements," 42 U.S.C.  1395w-
26(b)(3)(B)(i), not "covered" or "Medicare" benefits, an omission
that undermines the Commissioner's heavy reliance on these
qualifying terms.  In the second place, the BBA makes the provision
of supplemental benefits dependent upon the Secretary's approval.  
See id.  1395w-22(a)(3)(A).  Thus, those benefits arguably are
"covered" by the Program.
 Looking beyond what Congress said to what Congress
actually did, we find affirmative support for our interpretation
of subparagraph (B).  At the same time that it created subparagraph
(B), Congress eliminated a provision that would have accomplished
exactly the result which the Commissioner and her amici urge this
court to adopt.  An earlier version of the House bill provided that
a state could enforce its own beneficiary requirements if such
requirements were more stringent than those established under
federal law.  See H.R. 2015, 105th Cong.  4001 (section 1852(n)),
reprinted in 143 Cong. Rec. H4416, H4441 (daily ed. June 25, 1997).  
The conference agreement that added subparagraph (B) deleted this
provision.  See H.R. Conf. Rep. No. 105-217, at 611, 637-38,
reprinted in 1997 U.S.C.C.A.N. 176, 231-32, 258-59.  Notably, the
precursor to paragraph (3) in the same draft version also had
included language to the effect that consumer protections more
exacting than those established under subsection (b) would not be
preempted by federal regulation.  See H.R. 2015,  4001 (section
1856(b)(5)), reprinted in 143 Cong. Rec. at H4446.  Again, the
conference committee eliminated this language.  Congress sometimes
can speak as clearly by opting not to enact proffered language as
by enacting it.  See, e.g., INS v. Cardoza-Fonseca, 480 U.S. 421,
442-43 (1987) ("Few principles of statutory construction are more
compelling than the proposition that Congress does not intend sub
silentio to enact statutory language that it has earlier discarded
in favor of other language." (citation and internal quotation marks
omitted)); United States v. Rivera, 131 F.3d 222, 226-27 (1st Cir.
1997) (similar); Rhode Island v. Narragansett Indian Tribe, 19 F.3d
685, 700 (1st Cir. 1994) (similar).  And when Congress speaks,
courts charged with the delicate work of statutory construction
should listen.

III.  CONCLUSION
 The road we have traveled has been long and winding.  
Massachusetts posits that the arduousness of the journey itself
requires reversal:  Congress's intent cannot be "clear and
manifest," Rice, 331 U.S. at 230, if this court can discern it only
after undertaking such an odyssey.  But this is an especially
intricate preemption regime, and courts must do their best to
animate complex statutes as well as simple ones.  In this instance,
the length of our journey more accurately reflects the variety of
the arguments advanced rather than any uncertainty inherent in the
statutory regime   and we perhaps have prolonged matters unduly by
pausing along the way to illuminate subtle flaws in those arguments
out of respect for the earnestness that underlies them.  Finally,
and most importantly, we have felt it incumbent upon us to explain
how one   and only one   interpretation of the language that
Congress chose imbues each statutory provision with genuine
meaning.
 We need go no further.  Congress's intent to prefer an
exclusively federal regulatory scheme and to preempt all state
benefit requirements is clear and manifest, even if not immediately
apparent.  Consequently, the judgment below must be

Affirmed.

</body>

</html>